UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

JOAN MCCANN
W8975 Liberty Hill Court
New London, Wisconsin 54961

      Plaintiff,

      v.            Case No.: 16-cv-1310

EARTH SENSE ENERGY SYSTEMS, INC.    **JURY TRIAL DEMANDED**
W9715 State Road 96
Dale, Wisconsin 54931

      Defendant.

## COMPLAINT

COMES NOW Plaintiff, Joan McCann, by her counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendant, alleges and shows to the court as follows:

1. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case involves a federal question under the Americans with Disabilities Act ("ADA"), as amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §§ 12101, *et. seq*.

2. The unlawful employment practices of which Plaintiff complains occurred within the Eastern District of Wisconsin and therefore venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c).

3. Plaintiff, Joan McCann, is an Adult female resident of the State of Wisconsin residing in Outagamie County with a post office address of W8975 Liberty Hill Court, New London, Wisconsin 54961.

4. Defendant, Earth Sense Energy Systems, Inc., was, at all material times herein, a Wisconsin corporation with a principal office address of W9715 State Road 96, Dale, Wisconsin 54931.

5. In approximately July 2009, Ms. McCann was diagnosed with Stage IV Follicular Lymphoma.

6. Ms. McCann's Follicular Lymphoma is a type of cancer (non-Hodgkin Lymphoma) that develops when the body makes abnormal lymphoma cells, which are white blood cells that are normally designed and to fight infection, and the lymphoma cells build up in an individual's lymph nodes.

7. Ms. McCann's Follicular Lymphoma (hereinafter also simply referred to as Ms. McCann's "cancer diagnosis") is a permanent, physical health condition that negatively and substantially affects and limits, at minimum and among other things, her body's normal cell growth.

8. Ms. McCann receives chemotherapy and rituxan infusions in approximately two (2) to three (3) month intervals for her Follicular Lymphoma, in addition to lab work, scans, and physicians' appointments on an intermittent basis.

9. On or about April 14, 2012, Defendant hired Ms. McCann as a Controller.

10. During her employment with Defendant as a Controller, Ms. McCann's job duties and job responsibilities included performing accounting services for Defendant.

11. The position of Controller that Defendant hired Ms. McCann into on or about April 14, 2012 was a full-time, salaried position, working approximately forty (40) hours per week and earning approximately $53,000 annually, respectively.

12. During her employment with Defendant as a Controller, Ms. McCann reported directly to Chad Curtis, Operations Manager, who reported directly to Jed Martin, Owner.

13. During Ms. McCann's employment with Defendant, Curtis and Martin generally and routinely sought answers to any business-related questions directly from Ms. McCann, which was common practice vis-à-vis Defendant's organizational structure.

14. During Ms. McCann's employment with Defendant, Curtis and Martin were aware and/or had knowledge of Ms. McCann's cancer diagnosis.

15. During Ms. McCann's employment with Defendant, Curtis and Martin were aware and/or had knowledge of Ms. McCann's need for treatment and to attend physicians' appointments because of her cancer diagnosis.

16. In approximately August 2013, Defendant received correspondence from Ms. McCann's health care provider, stating that Ms. McCann was "a patient … actively on treatment with the Bellin Cancer TEAM," and that Ms. McCann, "… needs to work a maximum of 36 hours per week to allow her time to focus on her health and treatment."

17. Subsequent to approximately August 2013, Ms. McCann attended chemotherapy and drug treatments for her Follicular Lymphoma on Wednesday and Thursday nights, which made her nauseous and extremely tired on Fridays, Saturdays, and Sundays.

18. Subsequent to approximately August 2013, Ms. McCann's customary days and approximate hours of work were, respectively, Mondays through Thursdays, thirty-six (36) to forty (40) hours per workweek.

19. In approximately early February 2014, Defendant approved Ms. McCann's request for intermittent Family and Medical Leave Act ("FMLA") leave for her Follicular Lymphoma.

20. In approximately early February 2014, Ms. McCann began utilizing approved Family and Medical Leave Act ("FMLA") leave – approximately one (1) to two (2) days every three (3) months – for treatment(s) for her Follicular Lymphoma.

21. In approximately mid-February 2014, Defendant hired Bill (last name unknown) into the position of Accounting Assistant.

22. Shortly after Defendant hired Bill (last name unknown) into the position of Accounting Assistant in approximately mid-February 2014, Bill (last name unknown) began learning Ms. McCann's the job duties and job responsibilities of Ms. McCann's position.

23. Shortly after Defendant hired Bill (last name unknown)into the position of Accounting Assistant in approximately mid-February 2014, Curtis and Martin began meeting with Bill (last name unknown) after-hours and on Fridays – times and days, respectively, when Ms. McCann was customarily or normally not physically present at Defendant.

24. Shortly after Defendant hired Bill (last name unknown) into the position of Accounting Assistant in approximately mid-February 2014, Bill (last name unknown) began telling other employees of Defendant that he was hired to replace Ms. McCann.

25. In approximately late February 2014 or early March 2014, Ms. McCann terminated Bill (last name unknown).

26. In approximately late February 2014 or early March 2014 and after the termination of Bill (last name unknown), Defendant hired Patrick Pawlack into the position of Accounting Assistant.

27. Pawlack has less professional experience than Ms. McCann.

28. Prior to Defendant's hire of Pawlack in approximately late February 2014 or early March 2014, Ms. McCann previously rejected Pawlack as an applicant / new hire because he did not have the requisite and necessary knowledge and experience to fill the Accounting Assistant position.

29. In Pawlack's position of Accounting Assistant with Defendant, he reported directly to Ms. McCann.

30. After Defendant hired Pawlack into the position of Accounting Assistant in approximately late February 2014 or early March 2014, Curtis and Martin directed Pawlack to begin learning Ms. McCann's job duties and responsibilities.

31. After Defendant hired Pawlack into the position of Accounting Assistant in approximately late February 2014 or early March 2014, Curtis and Martin sought answers to business-related questions directly from Pawlack, as opposed to seeking same directly from Ms. McCann.

32. After Defendant hired Pawlack into the position of Accounting Assistant in approximately late February 2014 or early March 2014, Curtis and Martin met with Pawlack after-hours and on Fridays – times and days, respectively, when Ms. McCann was customarily or normally not physically present at Defendant.

33. When Curtis and Martin met with Pawlack after-hours and on Fridays – times and days, respectively, when Ms. McCann was customarily or normally not physically present at Defendant – Curtis and Martin asked Pawlack's opinion of how he believed Ms. McCann was performing in her position, how "good of an accountant" Pawlack believed that Ms. McCann was, and whether Pawlack believed that Ms. McCann was going to quit her employment at Defendant.

34. Subsequent to Defendant's approval of Ms. McCann's FMLA leave request for her Follicular Lymphoma in approximately early February 2014, Curtis and Martin made comments to Ms. McCann on a weekly basis regarding her cancer diagnosis, such as, when her cancer treatments would be done and when she could start working more hours at Defendant.

35. Subsequent to Defendant's approval of Ms. McCann's FMLA leave request for her Follicular Lymphoma in approximately early February 2014, Curtis, unsolicited and on a weekly basis, asked Ms. McCann: "Talk to me about your cancer." Ms. McCann consistently declined Curtis' inquiries.

36. On or about March 24, 2014, Curtis and Martin met with Ms. McCann (hereinafter simply the "March 24, 2014 meeting").

37. The purpose of the March 24, 2014 meeting was for Defendant to conduct Ms. McCann's annual performance review.

38. In March 2014 but prior to the March 24, 2014 meeting, Curtis and Ms. McCann met to review other employees' work performance and to prepare for those employees' annual reviews. During this meeting, Curtis told Ms. McCann, "Remember, if we don't give them a raise that means we want them gone." Curtis was referring to the notion that if Defendant does not give an employee a raise at his or her annual review, Defendant wants that employee to quit. Curtis continued: "You'll see the files come through and the ones we give the raises to are the ones we want to stay," or words to that effect.

39. In approximately March 2014 and April 2014 and when Curtis and Ms. McCann were conducting annual reviews for some of Defendant's employees, Curtis told Ms. McCann to give a "good review" and a "raise" to Dana Hoewich, Assistant, and a "bad review" and "no raise" to Pattie Boelter, Assistant, because Defendant wanted "Pattie to quit."

40. In March 2014 and April 2014, Curtis reiterated to Ms. McCann that Defendant was going to give raises to only those employees that it wanted to continue working for it, and that the employees who did not receive a raise, Defendant was hoping they would quit and, if they did not quit, Defendant would eventually terminate their employment.

41. During the March 24, 2014 meeting, Defendant told Ms. McCann that it was not giving her a raise.

42. During the March 24, 2014 meeting, Defendant changed Ms. McCann's compensation status, from a salaried employee to an hourly employee.

43. During the March 24, 2014 meeting, Defendant changed Ms. McCann's compensation level, from an approximately $53,000 annually to $26.00 per hour.

44. Defendant changed Ms. McCann's compensation status and level during the March 24, 2014 meeting because of her use of FMLA leave.

45. Defendant changed Ms. McCann's compensation status and level during the March 24, 2014 meeting because of her cancer diagnosis and her modified work and treatment schedule related to her cancer diagnosis.

46. During the March 24, 2014 meeting, Martin told Ms. McCann, "Because of your cancer, you're not able to give us what we need," or words to that effect.

47. During the March 24, 2014 meeting, Martin told Ms. McCann, "Because of your doctor's appointments and your health, you're not able to work the hours we need you to," or words to that effect.

48. During the March 24, 2014 meeting and when Martin made these comments to Ms. McCann – "Because of your cancer, you're not able to give us what we need," and, "Because of your doctor's appointments and your health, you're not able to work the hours we need you to," or words to that effect – Curtis physically raised his arms in the air and waived his hands towards Martin in an outward and apparent attempt to restrain Martin from making these comments.

49. On March 31, 2014, saw her treating physician, Mary A. Connelly, M.D., for her Follicular Lymphoma.

50. During Ms. McCann's visit with Dr. Connelly on March 31, 2014, Ms. McCann discussed her current work environment at Defendant with Dr. Connelly and how that work environment was stressful and caused her to feel anxious and depressed.

51. During Ms. McCann's visit with Dr. Connelly on March 31, 2014, Dr. Connelly informed Ms. McCann that stress, anxiety, and depression can have a negative impact on her Follicular Lymphoma.

52. During Ms. McCann's visit with Dr. Connelly on March 31, 2014, Dr. Connelly informed Ms. McCann that in her opinion, Ms. McCann's best option was to quit her job at Defendant as opposed to continuing to let it deteriorate and negatively affect her health.

53. In approximately May 2014, Martin told Ms. McCann that her cancer seemed to be affecting her work performance because, according to Martin, Ms. McCann was not "meeting my requests and time frames for completing those requests," or words to that effect.

54. In approximately May 2014, Martin told Ms. McCann that she was "ripping off my company with your FMLA," or words to that effect.

55. In approximately May 2014, Martin told Ms. McCann, "You're not a good accountant because you have cancer and your cancer treatments are a hassle," or words to that effect.

56. Subsequent to Defendant's approval of Ms. McCann's FMLA leave request for her Follicular Lymphoma in approximately early February 2014, Curtis and Martin micromanaged Ms. McCann's work performance, made unachievable demands of Ms. McCann, set unrealistic expectations and deadlines for Ms. McCann to meet, and provided Ms. McCann with mindless, redundant tasks to perform that occupied most, if not all, of her time, taking her away from performing her accounting duties. Curtis and Martin did not do this prior to Ms. McCann's FMLA

leave request for her Follicular Lymphoma in approximately early February 2014, but did so in a deliberate attempt to force Ms. McCann to quit her employment, knowing that she could not accomplish these tasks, meet these deadlines demands, and satisfy these expectations within her hours restriction and her treatment schedule for her cancer diagnosis.

57. For example, subsequent to Defendant's approval of Ms. McCann's FMLA leave request for her Follicular Lymphoma in approximately early February 2014, Martin came into Ms. McCann's office almost every day demanding that she accomplish a task or finish an assignment or project by the end of the day or week.

58. For example, Martin yelled at Ms. McCann when she did not fully complete a task or finish an assignment or project by the end of the day or by the end of the week, stating in a demeaning tone, "That's what happens when you don't work as many hours," or words to that effect.

59. For example, subsequent to Defendant's approval of Ms. McCann's FMLA leave request for her Follicular Lymphoma in approximately early February 2014, Martin demanded (at least five or six times) that Ms. McCann constantly update and change Defendant's policies in its employee handbook (which was not Ms. McCann's job), stating that it had to be completed before Ms. McCann was allowed to work on her accounting duties.

60. For example, subsequent to Defendant's approval of Ms. McCann's FMLA leave request for her Follicular Lymphoma in approximately early February 2014, Martin told Ms. McCann to review all of Defendant's accountings for the year 2013 and determine why there was a loss (as opposed to a surplus) – which was significantly time-consuming and unnecessary.

61. For example, subsequent to Defendant's approval of Ms. McCann's FMLA leave request for her Follicular Lymphoma in approximately early February 2014, Martin told Ms.

McCann to pay Defendant's vendors immediately – even though there was not enough money in Defendant's accounts to do so.

62. For example, subsequent to Defendant's approval of Ms. McCann's FMLA leave request for her Follicular Lymphoma in approximately early February 2014, Martin told Ms. McCann to "break down" income and expenses for each of Defendant's locations for the previous three (3) years – which was significantly time-consuming and unnecessary.

63. For example, subsequent to Defendant's approval of Ms. McCann's FMLA leave request for her Follicular Lymphoma in approximately early February 2014, Martin's wife reprimanded Ms. McCann for not immediately paying an invoice for $0.31.

64. For example, subsequent to Defendant's approval of Ms. McCann's FMLA leave request for her Follicular Lymphoma in approximately early February 2014, Martin demanded that Ms. McCann pay invoices immediately when they were submitted by third parties, even though they were not due until weeks or months later and Defendant did not have enough money in its accounts to pay the invoices.

65. For example, subsequent to Defendant's approval of Ms. McCann's FMLA leave request for her Follicular Lymphoma in approximately early February 2014, Martin demanded that Ms. McCann immediately pay personal invoices (such as cell phone, credit card, and health insurance invoices) for Martin and his wife, even though, when Ms. McCann did so, Defendant then had no money left in its accounts to pay vendors.

66. In May 2014, Ms. McCann found an invoice from "Herrling Clark Law Firm Ltd.," dated May 12, 2014, on her chair in her office at Defendant.

67. During Ms. McCann's employment with Defendant as a Controller, "Herrling Clark Law Firm Ltd." was the law firm that represented Defendant.

68. During her employment with Defendant as a Controller, Ms. McCann's job duties and job responsibilities did not include paying invoices from Defendant's attorneys and/or the law firm that represented Defendant.

69. During her employment with Defendant as a Controller and prior to May 2014, Ms. McCann never paid an invoice from Defendant's attorneys and/or the law firm that represented Defendant.

70. The invoice from "Herrling Clark Law Firm Ltd.," dated May 12, 2014, that Ms. McCann found on her desk in her office at Defendant in May 2014 included the following entries on the following dates:

> April 28, 2014: "Receipt And Review Of Email From Jed Martin Pertaining To Employee/FMLA."

> April 29, 2014: "Further Research on FMLA; Email To Jed Martin Regarding Two (2) Outstanding Issues. Receipt And Review Email From Jed Regarding FMLA Issue And Employment Issue; Research And Review FMLA Statute, Administrative Code Section And Case Law Regarding Same; Draft Email To Client"

> May 8, 2014: "Receipt And Review Of Email From Jed Martin And Employee File On Accountant."

71. In approximately the end of May 2014, Martin told Ms. McCann to complete Defendant's financial statements "within 3 days of months' end." In response, Ms. McCann told Martin that this task was time-consuming and virtually impossible to achieve because the information needed to complete these financial statements was not available until five (5) days after each month's end. Martin responded, "You must not be a good accountant if you can't complete such a simple task in that amount of time," or words to that effect.

72. On or about June 9, 2014 and due to the continued discrimination, harassment, and retaliation that Ms. McCann was facing and being subjected to, Defendant forced Ms. McCann to resign from it.

73. After Ms. McCann was constructively discharged by Defendant on or about June 9, 2014, Defendant replaced gave Ms. McCann's position to Pawlack.

74. In approximately late-June 2014, Defendant terminated Pattie Boelter's employment.

75. On or about August 8, 2014, Ms. McCann filed a complaint with the Equal Employment Opportunity Commission – Milwaukee Area Office ("EEOC"), which was designated as EEOC Charge No. 443-2014-01176, alleging disability discrimination against Defendant.

76. The EEOC issued Ms. McCann a Notice of Right to Sue on Charge No. 443-2014-01176, dated August 1, 2016.

77. Defendant is a covered employer for purposes of the FMLA.

78. During Ms. McCann's employment with Defendant, she did not meet the criteria under 29 C.F.R. § 825.217(a), which defines "key employee" as used in the FMLA.

79. Defendant employed at least 50 employees within 75 miles of Ms. McCann's work site.

80. At the time of Ms. McCann's FMLA leave request in approximately February 2014, she had been employed at Defendant for 12 non-consecutive months and had worked at least 1250 hours during those 12 months.

81. Ms. McCann did not exceed the amount of FMLA leave for any FMLA leave entitlement period.

82. Curtis' and Martin's respective and collective comments and conduct towards Ms. McCann from February 2014 to June 2014 was willful, intentional, and deliberate.

83. Ms. McCann has exhausted all administrative remedies and filing requirements prior to bringing this action.

### FIRST CAUSE OF ACTION – DISABILITY DISCRIMINATION

84. Ms. McCann re-alleges and incorporates paragraphs 1-84 of this complaint by reference.

85. Defendant intentionally discriminated against Ms. McCann on the basis of her disability by forcing her to resign, constructively discharging her and effectively terminating her employment, in reckless disregard for her federally protected rights under the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101, *et. seq*.

86. As a result of Defendant's intentional discrimination, Ms. McCann has suffered damages in the form of lost wages and other employment benefits, emotional distress, and attorneys' fees and costs.

### SECOND CAUSE OF ACTION – FMLA RETALIATION

87. Ms. McCann re-alleges and incorporates paragraphs 1-87 of this complaint by reference.

88. Defendant intentionally and willfully retaliated against Ms. McCann in the terms and conditions of her employment by reducing her compensation and by forcing her to resign, constructively discharging her and effectively terminating her employment, for exercising her rights under the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. §§ 2601 *et seq*.

89. As a result of Defendant's intentional and willful violation of the FMLA, Ms. McCann has suffered damages in the form of loss of wages and other employment benefits and insurance.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1. Order Defendant to make Plaintiff whole by providing appropriate back pay, front pay and/or reinstatement, liquidated damages, compensatory damages, punitive damages, pre-judgment and post-judgment interest, and reimbursement for other benefits and expenses in an amount to be shown at trial;

2. Grant to Plaintiff attorneys' fees, costs, and disbursements as provided by statute; and

3. Grant to Plaintiff whatever other relief this Court deems just and equitable.

**PLAINTIFF DEMANDS A JURY AS TO ALL TRIABLE ISSUES.**

Dated this 30th day of September, 2016.

          WALCHESKE & LUZI, LLC
          Counsel for Plaintiff

          s/ ***Scott S. Luzi*_____
          Scott S. Luzi, State Bar No. 1067405
          Jesse R. Dill, State Bar No. 1061704
          Kelly L. Temeyer, State Bar No. 1066294

WALCHESKE & LUZI, LLC
15850 W. Bluemound Road, Suite 304
Brookfield, Wisconsin 53005
Phone: (262) 780-1953
Fax: (262) 565-6469
sluzi@walcheskeluzi.com
jdill@walcheskeluzi.com
ktemeyer@walcheskeluzi.com